## MAPP *vs.* PHILLIPS.

1. A party having at different times had two agents appointed severally in the same business, upon a question as to the extent of authority given to the second agent, is not competent to prove the declarations of the first agent, as to his own powers, whilst holding the agency.

2. Where an agent is confessedly acting under a power of attorney, or written authority, his own declarations enlarging his powers, are incompetent evidence to bind his principal.

3. If an agent having possession of his principal's property for a specific purpose sells it, without authority, and absconds with the money, ratification by the principal, will not be established by his declaration that if he could get his money he would be satisfied.

4. In such a case, three months' forbearance to sue the purchaser for the property so illegally sold, will not, alone, amount to such acquiescence as will establish ratification.

Trover in Bibb Superior Court. Tried before Judge LAMAR at the November Term, 1860.

This was an action of Trover, commenced on the 2d day of August, 1859, by Eaton J. Mapp, against William R. Phillips, to recover damages for the alleged conversion of a negro man slave, named Isaac.

On the trial of the case in the Court below the following testimony was adduced, to-wit:

### EVIDENCE FOR THE PLAINTIFF.

JOHN RUTHERFORD testified: That he once owned the negro boy, Isaac, sued for in the action, and as the negro was in the habit of getting drunk, and did not therefore suit him, he swapped him to Gilbert, as the agent of the plaintiff, for a negro by the name of Washington; that Gilbert and Mapp both told witness that Gilbert was Mapp's agent for the purpose of the exchange of negroes; that Mapp made a bill of sale to witness for the negro which Gilbert as Mapp's agent swapped for Isaac; that Isaac was worth $1,100; Gilbert was afterwards trying to sell Isaac, and claimed to be Mapp's agent for that purpose, but witness never heard Mapp say that he had authority to thus dispose of the negro, but supposed that Gilbert had the authority to sell the negro, as Mapp had recognized his agency in the exchange aforesaid.

JAMES V. GRIER testified : That Gilbert, as Mapp's agent, hired the negro in dispute to Grier & Masterson during the year 1858, and received the hire therefor, until he, Gilbert, ran away ; that some time after Bishop sold the negro to Cox, the witness saw Mapp in Americus and in Macon looking for Bishop, to get the money for which he sold the negro to Cox; that Mapp also told witness that he went to Alabama partly on the same business ; that Mapp told witness that he had authorized Bishop to sell the negro to Gen. Armstrong, and that if he could get the money which Cox paid Bishop for the negro, he would be satisfied ; that when witness first saw Bishop he told the witness that he was Mapp's agent, and he also showed witness a letter which Mapp had sent to Gen. Armstrong.

THOMAS J. COX testified : That as the agent of Phillips, the defendant, he bought the negro in dispute, from Alfred Bishop, and paid him $1,300 for him ; that witness put the negro in the guard house, and that Phillips sent the negro to New Orleans, where he was sold.

Counsel for the plaintiff objected to the testimony of Rutherford as to the sayings of Gilbert unless his agency was established, which objection was overruled by the Court, and plaintiff excepted.

### EVIDENCE FOR DEFENDANT.

GILES GRISWOLD, in answer to interrogatories, testified : That about the last of April, or the first of May, 1859, at Griswoldville, in Jones county Georgia, the plaintiff, Mapp, told the witness that he gave Alfred Bishop a power of attorney to sell the negro in dispute, and that he had come to Griswoldville to make inquires for Bishop, knowing that Bishop had been, or was still agent for Samuel Griswold ; that after plaintiff learned that witness had not heard of Bishop for some time, he expressed fears that he would lose the money for the negro ; that plaintiff also said he was going to Macon to enquire about Bishop, but did not say for what.

Thomas J. Cox being recalled by the defendant, testified : That as the agent of Phillips, he bought the negro from

Bishop on the 4th of March, 1859 ; that Bishop told witness that he was Mapp's agent, and was by him authorized to sell the negro to any person, that he had come to sell or complete a contract made by Gilbert with Gen. Armstrong, and that if Armstrong did not take the boy, he, Bishop, was authorized to sell him to any one who would give $1,300 for him ; that Bishop referred witness to Gen. Armstrong for his authority ; that witness went to Armstrong, who read to him a part of a letter from Mapp to him, which Bishop had brought, and witness then went to Bishop and made the trade, as he has already testified to, in behalf of plaintiff; that Bishop made, at the time, the following bill of sale to-wit :

" GEORGIA, BIBB COUNTY :

" Received of T. J. Cox $1,300, in full payment for a certain negro man named Isaac, light complexion, twenty-four years of age, which boy I warrant to be sound in body and mind.   I also warrant and defend the right and title of said Isaac, and a slave for life.   This March 4th, 1859.

"ALFRED BISHOP,
"Agent for E. J. Mapp.

" Witness :
" Job H. Cherry."

Counsel for the plaintiff objected to all the testimony relative to the sayings of Bishop as to his authority to sell the negro, and as to any and all statements of Bishop not strictly within the scope of the letter given him by Mapp to Armstrong.

### EVIDENCE FOR THE PLAINTIFF IN REBUTTAL.

Gen. JAMES W. ARMSTRONG testified : Gilbert, as the professed agent of Mapp, bargained the negro in dispute to the witness at $1,250 ; that Gilbert said he would take the responsibility of selling the boy to me ; that the negro was left in my possession until Mapp could be heard from ; that witness waited to hear from Mapp for two or three weeks ; that in the meantime Gilbert ran away ; witness then wrote to Mapp about the trade, and some time thereafter Alfred Bishop

Mapp *vs.* Phillips.

brought to witness a letter from Mapp, and the witness finding that the boy was a drunkard and a gambler, and would not suit him, and that the price was raised to $1,300, he delivered the boy to Bishop ; that on the same day, and before Cox bought from Bishop, Cox called on witness to know what authority Bishop had to sell the negro, when witness got the letter aforesaid, and read the material points to him; that this letter was the only authority which Bishop purported to have from Mapp to sell the boy to me, and it was upon the authority of the letter that witness gave the boy up to Bishop ; that Gilbert had had the boy in Macon for sale some time before witness bargained for him ; that the following was a copy of the letter, to-wit :

"FEBRUARY THE 25th, 1859.

" *Col. Armstrong :*

SIR :—I received your favor of the 10th instant, stating that Mr. Gilbert had sold you my boy Isaac for $1,250, for which he had no authority for so doing ; but in my response to you, in reply to yours of the 10th, I gave you the full particulars of all the circumstances, which I think will give full satisfaction to you, etc. I now send Mr. Alfred Bishop, fully authorized to represent me in all the particulars to sell you Isaac, to receive the pay, to make you a full and legal bill of sale, or to receive him and bring him home; in short, to transact any business on that subject for me. I think when you see Mr. Bishop and talk with him on the subject, that you will be satisfied on the subject. Now, sir, any trade or settlement that Mr. Bishop makes with you in relation to the boy Isaac, in writing or word, for me, you may consider it full and legal, as he is my agent, and is ready and willing to testify to the illegality of the sale of the boy to you at the time you bought him, etc. I hope you and Mr. Bishop will settle without any further delay or trouble.

"Respectfully yours,

"E. J. MAPP.

" I send in the care of Mr. Bishop.

" P. S.    Col.: If you and Mr. Bishop should not agree in

terms of the price of the boy, please deliver him up to said
Bishop to bring him home for me, and you will much oblige,

"E. J. M."

Upon these facts, and under the charge of the Court, the
jury returned a verdict for the defendant.

Counsel for the plaintiff then moved for a new trial, pred-
icated upon the following grounds, to-wit :

1. Because the Court erred in overruling the objection of
plaintiff's counsel to the testimony of Rutherford as to the
sayings of Gilbert and his doings.

2. Because the Court erred in admitting (over the objec-
tion of plaintiff's counsel) the testimony of Cox as to the
sayings of Bishop in regard to his authority from Mapp to
sell Isaac to any person.

3. Because the Court erred in admitting in evidence the
statements of Bishop, which were not strictly within the
scope of the letter given to him by Mapp to Armstrong.

4. Because the verdict is decidedly and strongly against
the weight of evidence.

5. Because the verdict is against law and evidence.

The presiding judge overruled the motion and refused the
new trial, which decision is the error complained of in this
case.

BAILEY & DEGRAFFENREID for plaintiff in error.

L. N. WHITTLE for defendant in error.

*By the Court.*—JENKINS, J., delivering the opinion.

1. The testimony of Rutherford, the admission of which
is the error assigned in the first exception, related to the
authority given to another agent of the plaintiff in error to
sell this slave.  This agency, whatever it may have been,
had expired before the agency was cast upon Bishop, who
sold to the defendant.  Bishop was not a sub-agent, appoint-
ed by Gilbert, the first agent, but derived his authority di-
rectly from Mapp, the plaintiff in error, and that, too, after
Gilbert had absconded.  We do not perceive how the second

agency can be connected with the first, for the purpose of enlarging the powers of the second. The two delegations of authority being entirely distinct acts, it was certainly the privilege of the principal, either to curtail or to enlarge the authority. If this evidence of Rutherford's was offered to show the extent of Bishop's authority, it was incompetent and illegal. If for any other purpose, it would seem to be irrelevant, and *therefore* illegal. We think the Court below erred in admitting it.

2. The 2d and 3d exceptions assign error, in that the Court erred in permitting Cox, who was the agent of the defendant in error, in the purchase of the slave Isaac, from Bishop, as agent of the plaintiff in error, to testify to the sayings of Bishop as to his authority to sell; those sayings not being strictly within the scope of his written authority. It appears that at the time of Bishop's appointment as agent, the slave Isaac, the subject of this agency, was in the possession of one Armstrong, then in treaty with the plaintiff in error for the purchase of him. Bishop was sent by the owner, to Armstrong, with a letter, stating that he, Bishop, was fully authorized to negotiate with Armstrong touching the sale; and failing to effect that, was to receive Isaac from Armstrong, and take him back to his owner, Bishop's principal. This is distinctly stated in the body of the letter, and as distinctly repeated in a postscript. Bishop, failing to negotiate a sale to Armstrong, received the boy Isaac from him, and instead of taking him home, to his owner, took him to Macon and put him upon the market for sale. Cox, the agent of the defendant, commenced a negotiation with Bishop for him, but took the precaution to inquire into Bishop's authority to sell. Being referred by Bishop to Mapp's letter to Armstrong, as the evidence of his authority in the premises, Cox went to Armstrong, seeking information. He testifies that Armstrong read him a part of the letter, whereupon he returned to Bishop and made the purchase. Armstrong testifies that he read to Cox "the material points" of the letter. Points material to what? Clearly to Bishop's authority to sell the slave.

In this letter there is no ambiguity whatever. It is an authority *to sell to Armstrong,* not to any other person ; not a *general* authority to sell. Bishop distinctly stated to Cox that this letter contained his authority in the premises. Any declarations, therefore, of Bishop to Cox, claiming for himself a larger authority than that conferred by the letter, were clearly incompetent evidence. *Story on Agency,* sec. 76. *Paley on Agency,* 179, *and note. Ibid.* 198, *and note. Hogg vs. Smith.* 1 *Taunt. R.* 347, 352. *Murray vs. Ea. Ind. Co.,* 5. *B. & A.* 204–210–211. We, therefore, think there was error in this ruling.

3. The remaining exceptions assign error, in that the Court below refused to grant a new trial on the ground that the verdict was contrary to law and evidence.

Counsel for defendant in error seek to sustain the verdict on two grounds, 1st, that there was sufficient evidence of Bishop's *general* authority to sell, and 2ndly, that plaintiff in error subsequently ratified the act.

The authority to sell must be derived either from the letter to Armstrong, from Bishop's declarations, or from the declarations of the plaintiff in error, as testified to by Griswold.

We find no such authority to sell in the letter to Armstrong, (which see in statement.) All expressions in the letter conveying the idea of full power, in Bishop, as the agent of plaintiff in error, relate expressly to the sale to Armstrong. It is clear that the writer did not contemplate a sale to any other person. It is clear he intended that, in the event of Armstrong declining the purchase, Bishop should receive the slave, and *take him back to the owner ;* nothing more. Humane masters desiring to sell slaves, are always cautious into *whose* dominion they transfer them. This is a plain dictate of humanity ; an obvious duty. But in any view, the law recognizes the right of the principal by clear, unequivocal terms, to limit the power of his agent. We think it was clearly limited in this instance by the written authority, and that the limitation was as clearly exceeded.

We have already said that the declarations of Bishop, to

enlarge the authority conferred by the letter, were incompetent evidence for that purpose, and have only here to add that from this source, no general authority can be derived. Mapp, the plaintiff in error, stated to Griswold, "that he had given to Bishop, a power of attorney to sell this slave, that he had heard nothing from him since—was going to Macon to inquire about Bishop—and knowing that he had been in the employment of Griswold, had stopped there to inquire, and (finding Griswold ignorant of his whereabouts) feared he (Mapp) would lose his money."

If the written authority, in evidence, will answer the description given by Mapp in this conversation of the power to Bishop, he must be understood to refer to that—unless there be other proof that he had actually given some other authority in writing touching this business.

The letter to Armstrong is certainly, not in form, a technical power of attorney. But the law does not exact technicalities in such matters. It requires only a clear, distinct expression of the authority intended to be conferred. The power intended here, being a special limited one, was well set forth in a letter to the only person to whom the writer gave the agent authority to sell. Still *it was a power of attorney to sell the negro.* Circumstances did not require more detail in this conversation than Mapp used. It does not appear that he knew, then, of the sale by Bishop to defendant in error. Indeed the reasonable presumption is that Bishop had left him wholly ignorant of his acts and doings, and it is but fair to infer that he then supposed Bishop had sold to Armstrong, as authorized, and made way with the purchase money, and hence his fears that he would lose it. To hold that, in this conversation, Mapp referred to some other power of attorney, would be a forced construction of language. So that, we do not find in *this*, evidence of a general power to sell.

The remaining question is that of ratification.

The evidence of it is said to be found, 1st, in the evidence of Griswold; 2d, in that of Grier; 3d, in his long acquies-

Mapp *vs.* Phillips.

cence. It is conceded that there has been no direct positive ratification. It is arrived at inferentially.

To *infer* ratification, either from declarations or acts, it must appear affirmatively, that at the time of making the declarations, or doing the acts, the principal knew that the agent had performed the act, claimed to have been ratified. It does not appear that at the time of his conversation with Griswold, plaintiff in error knew that Bishop had sold the slave to defendant in error; indeed, the contrary would seem to be highly probable. We, therefore, find no evidence of ratification in Griswold's testimony.

Is it to be found in Greer's testimony? All that bears upon this question is this, "witness saw Mapp in Americus and in Macon, looking for Bishop, to get the money for which he sold the negro to Cox; that Mapp also told witness he went to Alabama, partly on the same business; that he (Mapp) had authorized Bishop to sell the negro to Gen. Armstrong; and that if he could get the money which Cox paid Bishop for the negro, he would be satisfied." In this conversation, speaking of the authority he had given Bishop, he states, in entire consistency with his written authority, that he had authorized him to sell the negro to Gen. Armstrong. This was equivalent to saying that he had not authorized the sale actually made; but he adds, if he could get the money paid to Bishop he would be satisfied. At most it is only a declaration that he would ratify the sale on a certain condition. This, and any efforts he may have made to find Bishop, may be put to the account of a desire to avoid litigation—to submit to a wrong on certain terms; and was advantageous to the defendant in error, who should not be permitted to wrest such declarations and acts to the prejudice of plaintiff. There is nothing in it which amounts to, or indicates the intention of, ratification.

Beyond this there is no evidence of acquiescence other than the lapse of time, between his knowledge of the sale and the commencement of the action. It appears that about three months intervened. It does not appear that any term of any court, having jurisdiction of the case, had been allowed to

pass. There is no settled limitation of time within which suit must be brought, to avoid the legal inference of ratification. The authorities say that acquiescence, or non-action, more properly speaking, must not extend beyond a reasonable time. Circumstances must always be looked to to determine what is a reasonable time. We think that, under the circumstances of this case, the action was commenced within a reasonable time.

Our opinion is that the verdict is contrary to the law and the evidence, and that, for all the reasons assigned in this opinion, the Court below erred in not setting aside the verdict and ordering a new trial, and we therefore reverse the judgment.

Judgment reversed.